**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 17 2013

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

RUDY F. and BETTY WEBB, husband and wife
on behalf of themselves, and all others similarly situated

*Plaintiffs*

v.                                                     Civil Case No. 4:13cv0232-Jmm

EXXON MOBIL CORPORATION                          **Jury Trial Demanded**
d/b/a EXXONMOBIL®
EXXONMOBIL PIPELINE COMPANY
EXXONMOBIL PIPELINE COMPANY, L.P.
MOBIL PIPELINE COMPANY
                                                 This case assigned to District Judge Moody
        *Defendants.*                            and to Magistrate Judge Kearney

## COMPLAINT – CLASS ACTION

Come now the Plaintiffs, pursuant to Fed. R. Civ. P. 23(a) & (b), and U.S. E.D. L.R.

23.1, on behalf of themselves and others similarly situated, and for their Complaint – Class

Action, states as follows:

### I. INTRODUCTION & STATEMENT OF CASE

1.      This class action lawsuit is brought on behalf of all persons and entities who have

a contractual easement on their property for the ExxonMobil Pegasus Pipeline ("Pegasus

Pipeline"), which runs from Patoka, Illinois through Missouri, Arkansas and Corsicana, Texas.

This lawsuit is similar and related to the federal lawsuit, *Kathryn Chunn, et al. v. Exxon Mobil*

*Corporation, et al.* Civil Case No. 4:13-CV-199 BSM, pending before the Honorable Brian

Miller.

2.      Oil pipeline spills are becoming well known publicly for the considerable damage

caused to the physical environment and the substantial direct and consequential economic loss

surrounding the pipeline spill. The Pegasus Pipeline has spawned a direct, public knowledge that

1

real property in close proximity to the Pegasus Pipeline is at risk for permanent damage to real property. This multi-state class action lawsuit involves the worst crude oil and tar sands spill in Arkansas history and directly impacts all individuals who have a contractual easement with the Defendants for the Pegasus Pipeline.

3.      The Pegasus Pipeline transports Wabasca heavy crude (Western Canada) from Patoka, Illinois, through the states of Arkansas, Missouri and to Nederlands, Texas. The Pegasus Pipeline supplies crude oil from Canada to the Gulf Coast. The Pegasus Pipeline was built in the 1940s and originally ran from Patoka, Illinois through Corsicana, Texas. Exxon has contractual easements with property owners, which allows Exxon to operate the Pegasus Pipeline from Illinois, through Missouri, Arkansas and Texas. Exxon has an affirmative statutory and contractual duty to maintain the Pegasus Pipeline in a safe condition.

4.      On March 29, 2013, a section of the Pegasus Pipeline in Mayflower, Arkansas, was in an unsafe, defective and deficient condition presenting an immediate environmental and real property harm. The over sixty-five year old Pipeline fractured and ruptured causing permanent property damage to the Plaintiffs and the members of the class. The Pipeline fracture was approximately 22 feet long. *See* picture attached hereto as Exhibit "1," and hereby made a part of the record hereof. Plaintiffs bring this lawsuit seeking rescission of the contractual easements, or, in the alternative, damages from breach of contract.

5.      The Pegasus Pipeline running throughout the State of Texas, Arkansas, Missouri and Illinois is similarly situated and maintained under a predominating, common course of corporate policy, pattern, practice and conduct, which includes, but is not limited to the same or similar inspection, maintenance, evaluation, operation and analysis. Additionally, due to Defendants' common course of corporate policy, pattern, practice and conduct concerning the

2

Pegasus Pipeline, Defendants put at risk the homes and property along the entire length of the Pegasus Pipeline and have breached their duty, responsibility and obligation to properly maintain the Pipeline in a safe condition.

6. Exxon's common course of corporate policy, pattern, practice and wrongful conduct concerning the Pegasus Pipeline, which specifically caused real property damage and injury to the Plaintiff, persons and property in the Mayflower area and community, also puts those persons with a contractual easement for the Pipeline at risk of future fracture and rupture because of Defendants' unsafe, defective and deficient pipe, the history of the Pipeline and similar pipelines, Defendants' maintenance history and Defendants' wrongful inspection, maintenance, evaluation, operation and analysis. Plaintiffs bring their lawsuit on behalf of themselves and others similarly situated seeking rescission of the contractual easements, or in the alternative, damages for breach of contract.

## II. PARTIES

7. Plaintiff Rudy F. and Betty Webb have real property located at 48 Snuggs Circle or Northside in Mayflower, Faulkner County, Arkansas and have an easement on their property for the Exxon Pegasus Pipeline. Exxon has failed to properly maintain the Pipeline located within the easement in a safe condition on the Webbs' property. The Webbs have directly experienced real property injury and diminishment of value as a result of the Exxon Pegasus Pipeline failure, and are subject to future injury and damages due to the breach of contract by Exxon.

8. Exxon Mobil Corporation, also known as ExxonMobil® (hereafter "Exxon"), has common proprietary interests, ownership interests, or joint ventures with Separate Defendants ExxonMobil Pipeline Company, Mobil Pipeline Company and ExxonMobil Pipeline, L.P., and

3

upon information and belief, are involved with the ownership, operation and maintenance (or lack thereof) of the defective and unsafe Pegasus Pipeline.

9.     Exxon is headquartered in Irving, Dallas County, Texas at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298. Exxon is incorporated in Delaware, and is identified to be found by the Texas Secretary of State at 800 Bell Street, Room 2605, Houston, Harris, County, Texas.  Exxon may be served through the Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. Exxon publicly promotes and markets itself as the "world's largest publicly traded international oil and gas company."  It engages in oil exploration, development, marketing, production, refining, transportation, piping and exportation. It amasses revenues in the hundreds of billions each year and is considered the number one or one of the top revenue earning companies in major financial magazines and reports.  Exxon has previously had major oil spills and failures in other parts of the United States with its pipelines, including failures of the Pegasus Pipeline. Moreover, Exxon has been penalized by governmental agencies for pipeline deficiencies, including prior safety, inspection and maintenance problems pertaining to the Pegasus Pipeline.

10.     ExxonMobil Pipeline Company, L.P., ExxonMobil Pipeline Company (collectively EMPCO) and Mobil Pipeline Company are companies that upon information and belief own, maintain or operate the Pegasus Pipeline, are directly related to or are affiliated with each other, Exxon and ExxonMobil and have ownership interests in joint interest pipelines and operate proprietary and joint venture distribution terminals in the United States.   Upon information and belief, EMPCO is located and headquartered at 800 Bell Street, Houston, Harris County, Texas.  Mobil Pipeline Company is an affiliate of ExxonMobil Pipeline Company and operates a facility in Patoka, Illinois where it maintains documents pertaining to the corporate

4

activities.  It is also located at 800 Bell Street in Houston, Harris County, Texas.  Exxon, EMPCO and Mobil are collectively referred to hereinafter as Defendants.

11.     At all relevant times alleged herein, Defendants owned and failed to maintain the Pegasus Pipeline, which transports hazardous liquids through the States of Arkansas, Texas, Missouri and Illinois.

### III. JURISDICTION AND VENUE

12.     This Court has specific and general *in personam* and *in rem* jurisdiction over Exxon.  Exxon earns millions (if not billions) in revenue and profits from its economic activities in Arkansas and has real and personal property throughout the State of Arkansas, including this federal district.  A substantial part of the wrongdoing alleged in this Complaint took place in Arkansas, Exxon is authorized to conduct business in the State of Arkansas and Exxon purposefully and systematically avails itself of the oil commodity and transportation markets of the State of Arkansas, which are sufficient bases for this Court to exercise jurisdiction over Exxon under traditional notions of fair play and substantial justice.

13.     Venue is proper in this district pursuant to 28 §§ U.S.C. 1391(a) and (b) because a substantial part of the events, acts and omissions giving rise to the claims occurred in the Eastern District of Arkansas where Exxon has a substantial, ongoing, systemic physical and economic presence.

14.     This Court has subject matter jurisdiction over this lawsuit.  There is complete federal diversity pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs and there is a complete diversity of citizenship among the parties.  Additionally, pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d), there are more than 100 class members in the states involved and the damages alleged

are in excess of $5,000,000.00, exclusive of interest and costs in the aggregate amount in controversy, thus, original jurisdiction in this court is proper.

## IV. FACTUAL ALLEGATIONS

15.     Defendants have contractual easements with property owners, which allows Exxon to operate and maintain the Pegasus Pipeline, which transports Wabasca crude oil and, upon information and belief, tar sands (with toxins) through the State of Arkansas.  The toxins in the crude oil and tar sand mixture include chemicals such as benzene (which causes cancer and blood disorders in human studies) and hydrogen sulfide, which is a highly toxic gas. The crude oil contains polycyclic aromatic compounds (PACs"), which may cause cancer to skin, lung and other sites on the body and are toxic.  Further, the crude oil and tar sands mixture is also highly flammable, which can release vapors that readily form flammable mixtures and can flash or explode if ignited or can ignite by accumulation of static charges.  *See* Exxon Material Safety Data Sheet, attached hereto as Exhibit "2," adopted herein by reference and hereby made a part of the record hereof.

16.     The Pegasus Pipeline between Corsicana, Texas and Patoka, Illinois was originally constructed in 1947 and 1948 encompassing 650 miles.  *See* Exhibit "3," attached hereto.  It is 20-inch diameter pipeline, with a 0.312" wall thickness that has a 95,000 barrels per day capacity (a barrel of crude oil contains 42 gallons or 159 liters). The Pipeline is an API 5LX-42 pipe and contains both seamless pipe and low frequency electric resistance welded pipe ("ERW").  The Pipeline is buried two feet or twenty-four inches underground through the four contiguous states with a distance of 18 miles between isolation valves.

17.     Today, the Pipeline traverses an area from Nederlands, Texas through Arkansas, near Mayflower, north of Little Rock and continues upwards through Northeast Arkansas into

Missouri and into Patoka, Illinois (approximately 850 miles). The Pipeline runs underground, including under or abutting major watershed resources, which also may provide drinking water for large populations of people residing near the Pipeline, including, but not limited to: Lake Maumelle, the Arkansas River, Red River, Lake Ouachita, White River and Mississippi River. The Pipeline runs underground at a depth, which is to not interfere with soil cultivation pursuant to standardized, form contract easements provided by property owners. The Defendants are the successors and assigns of these standardized, form contract easements and are required to inspect and maintain the Pipeline and ensure it is safe, not defective and unreasonably dangerous.

18.     Defendants transport hazardous liquid through Illinois, Missouri, Arkansas and Texas, including numerous, navigable waterways. Defendants have mandatory inspection and safety requirements for operating a pipeline carrying hazardous liquid, such as the liquid contained in the Pegasus Pipeline, including the creation of an overall pipeline operating and safety plan, integrity management and inspection requirements. Further, the oil and gas industry, has created internal rules and policies pertaining to the maintenance, inspection and integrity management of hazardous liquid pipelines, such as the Pegasus Pipeline. These duties to maintain a safe pipeline are non-delegable and require the owner and operator of the pipeline to ensure that it is safe throughout the entire course of the pipeline. These duties and obligations are part of the contractual obligations of Defendants pursuant to the Pegasus Pipeline easements. Defendants have violated statutory and industry standards for properly maintaining and operating a safe pipeline.

19.     The unsafe and defective Pipeline, which transports crude oil or other substances such as tar sands with toxins under high pressure located in close proximity to houses, where people reside and have clean air and safe residential drinking water resources, is an immediate

7

and ultra-hazardous condition presenting an immediate risk and serious danger to people's lives, property and water. This hazardous activity creates a zone of danger to those in close proximity to the Pipeline.

20.     At all relevant times alleged herein, Defendants failed to inspect and maintain their unsafe and defective Pipeline, which was transporting crude oil and other substances such as Canadian tar sands (with toxins) primarily underground from Patoka, Illinois to Corsicana, Texas and through a large section of the State of Arkansas near and under people's real property and under and through several main water resources, which provide drinking water to large numbers of citizens who reside in proximity to the Pipeline.

21.     The Pegasus Pipeline is unsafe and defective. Pegasus Pipeline is an ERW pipeline, which was manufactured before the 1970's. ERW pipelines manufactured before the 1970's are known in the industry to have problems with fractures along weld seams and have been the source of studies and analysis for excessive failures involving the transportation of oil and gas and hazardous substances. The United States Department of Transportation, which regulates oil and gas pipelines, issued a notice and alert to companies involved in the oil and gas industry in 1988, and by addendum in 1989, that ERW pipelines were known to have problems with ERW seams and handling increased pressure resulting in catastrophic pipeline fractures and significant spills.

22.     Further, in approximately 1987, the Pegasus Pipeline experienced a major rupture near Corsicana, Texas, spilling hazardous material and causing a fire.

23.     Notwithstanding these prior problems with ERW pipeline, and in disregard of damage to real property values, the Defendants, in 2006, in order to maximize profits, reversed the Pegasus Pipeline flow to increase the flow of crude oil southward from Canada to the Gulf

Coast. The Defendants desired to transport larger amounts of Canadian crude tar sands, which is more abrasive to the Gulf Coast through the Pegasus Pipeline running through Illinois, Missouri, Arkansas and Texas. It is known in the industry that a change in the direction of oil flow in a pipeline can affect the hydraulic and stress demands on the pipeline and the abrasive quality of the hydrocarbon product can increase corrosion and deteriorate the quality of the pipe. The pipe was in a defective, unsafe condition and the Defendants' corporate profit-enhancing decision to run a higher volume and more abrasive crude hydrocarbon through the Pipeline put further stress demands on the over sixty-five year old defective and unsafe pipe. During this time period, Defendants failed to inspect the Pegasus Pipeline under the Mississippi River waterway as required by federal law and received a violation.

24.     In 2007-2008, Defendants considered and evaluated replacing the aged, over sixty-five year, unsafe and defective Pegasus Pipeline. Defendants knew the replacement of the Pegasus Pipeline was necessary for its safe operation. Rather, than install the new, safer and larger pipeline, Defendants, instead, to maximize profitability for record profits, deliberately chose to continue to use the older, smaller diameter, pre-1970 ERW Pegasus Pipeline and increase the capacity of the crude oil and tar sands being transported southward to Texas.

25.     In 2009, Defendants increased the capacity of the Pipeline by 50% or 30,000 barrels including the reactivation of several pump stations along the pipeline. This reactivation and enhancement was to enable the transportation of additional Canadian crude from the Midwest to Gulf Coast refineries. The transportation of these types of tar sands imposes greater risks to pipeline integrity, including greater corrosive effects on pipelines, which are defective and unsafe and pose risks to people and property in close proximity to the Pipeline. The Pipeline was and has not been properly and adequately inspected or maintained to ensure the safe

9

transport of crude oil and/or tar sands through the entire route of the Pegasus Pipeline traversing through Arkansas.

26.     After this reversal of flow and increase in crude oil capacity, hydraulic and stress demands increased on the pipeline weakening the pipeline creating a further unsafe and unreasonably dangerous condition, which major disaster and pipeline fracture and rupture was inevitable. On or around March 29, 2013, a major, catastrophic break occurred in the Pipeline near Mayflower in Faulkner County, Arkansas, near mile-post 315, causing several thousands of barrels of oil and toxic contaminant (in excess of 27,000 barrels of oil and contaminant) to be released into the nearby community adjacent to the Pipeline. The release of the oil affected a large area around Mayflower, including the Plaintiffs' property. The crude oil migrated into the North Woods Subdivision along North Starlite Road into a bar ditch adjacent to a Union Pacific Railroad line, into a creek and into a tributary to a cove of Lake Conway, which is also a tributary to the Arkansas River. The release of the oil due to Defendants' unsafe and defective pipeline running through the State of Arkansas caused an extensive, continuous and nationally publicized evacuation of people from the real property, contaminated real property, migrated into water sources and impacted air quality. The environmental catastrophe, which occurred in Mayflower, Arkansas, exposed the dangerous condition of the entire Pegasus Pipeline and exposed Exxon's systemic failure to properly maintain the Pipeline, exposing property owners with easements to damages resulting from the unsafe and defective pipeline on their property. The environmental footprint of the Pegasus Pipeline extends along the entire pipeline for those property owners that have a contractual easement.

27.     The Pegasus Pipeline running throughout the State of Arkansas is most likely to be similarly situated and maintained in a defective, unsafe condition under a predominating,

common course of corporate policy, pattern, practice and conduct which includes but is not limited to the same or similar inspection, maintenance, evaluation, operation and analysis.

28. This predominating, common course of Defendants' corporate policy, pattern, practice and conduct concerning the Pegasus Pipeline which specifically caused damage and injury to persons and property in the Mayflower area and community and also puts similarly situated pipeline at risk of fracture and rupture because of the unsafe, defective condition of the Defendants' Pipeline and the corporate Defendants' negligent inspection, maintenance, evaluation, operation and analysis. The property owners along the Pegasus Pipeline have decreased real property damage because their property is located in close proximity to an unsafe and defective pipeline, which is on their easement. The Pegasus Pipeline has caused the worst oil spill in Arkansas history affecting real property value and has also previously ruptured in Texas. These major pipeline spills and the age of the ERW pipeline diminish the property value for property owners with easements for the Pipeline.

29. Due to Defendants' unsafe, defective Pipeline and common course of corporate policy, pattern, practice and conduct concerning their Pipeline, all persons who owned real property as of March 29, 2013 with a Pegasus Pipeline easement are directly impacted and the value of their real property is diminished in a fairly uniform amount along the geographic course of the Pipeline. Plaintiffs bring this lawsuit on their behalf and for these similarly situated property owners to void and rescind the contractual easement, or alternatively, to recover damages for breach of contract, including diminished value of the real property caused by Exxon's breach of the easement.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

30.     Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs and other class members the defects with the Pegasus Pipeline described herein and its unsafe condition. Defendants kept Plaintiffs and other class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiffs, nor the other class members could have discovered the defect, prior to March 29, 2013, even upon reasonable exercise of diligence.

31.     Defendants were aware of the problem with their Pipeline and continued to utilize the Pipeline with increased capacity under circumstances where they knew or should have known that the Pipeline was defective and unsafe in its condition to transport crude oil southward from Canada to the Gulf Coast.

## VI. CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this claim for themselves and for all others similarly situated for class-wide rescission relief, including injunctive relief, or in the alternative, for damages, pursuant to Fed. R. Civ. P. 23(a) and (b), (b)(2), (b)(3) and U.S. E.D. Ark. L.R. 23.1. Plaintiffs seek to certify this lawsuit as a class action and to be appointed as the class representatives to bring this collective action to rescind all easements for class members and for an order enjoining Defendants from operating the Pegasus Pipeline and further ordering Defendants to remove the Pegasus Pipeline from the easements, or alternatively, for damages.

33.     The class is comprised of "all persons and entities who owned real property as of March 29, 2013, with an easement for the Pegasus Pipeline on their real property from Patoka Illinois to Corsicana, Texas." The class members may be identified with precision and by objective criteria. The exact number of class members is unknown at this time, but the

approximate size of the class is in the thousands. Exxon will have the exact number of class members and identity of each class member. Thus, under Fed. R. Civ. P. 23(a)(1), the class is so numerous that joinder of all members is impracticable.

34. Pursuant to Fed. R. Civ. P. 23(a)(2) and E.D. L.R. 23(2)(b)(iii), there are questions of law or fact common to the class members. The class members own property subject to easements allowing Exxon to operate and maintain the Pegasus Pipeline. Defendants have operated and maintained the Pegasus Pipeline in an unsafe and defective condition, which is hazardous to life, property and the environment. The claims of the Plaintiff and class members arise from a common nucleus of operative facts relevant to each class member and each member of the designated class sues under common legal theories. Common issues of law or fact for the class include, but are not limited to:

(a) Whether Defendants operated and maintained the Pegasus Pipeline in an unsafe and defective condition?

(b) Whether the Defendants failed to properly maintain the Pegasus Pipeline in a safe condition?

(c) Whether Defendants breached their duties and obligations pursuant to the Pegasus Pipeline easements?

(d) Whether Defendants breached their obligation to properly maintain the Pegasus Pipeline in a safe condition?

(e) Whether the easements should be voided and rescinded for Defendants' material breach of the easements and Defendants' breach of their obligations to maintain a safe pipeline?

13

(f)     And, whether Defendants should be enjoined from operating the Pegasus

Pipeline and should be required to remove the Pipeline from the property

of the class members?

35.     Pursuant to Fed. R. Civ. P. 23(a)(3), the claims of the proposed class representatives are typical of the claims for the rest of the class members.  There is common liability and a common wrongful conduct by the Defendants applicable to all class members. Further, the defenses interposed by the Defendants are expected to be common toward the class members.

36.     Pursuant to Fed. R. Civ. P. 23(a)(4), the representative parties will fairly and adequately represent and protect the interests of the class members.  Pursuant to E.D. L.R. 23.1(b)(ii), the proposed class representatives will fairly and adequately represent the interests of the class members because the class members have similar easements for the Pegasus Pipeline, Exxon has operated and maintained the Pipeline in a defective, unsafe Pipeline and common course of corporate policy, pattern, practice and conduct concerning the Pegasus Pipeline and because the class representatives bring this lawsuit for the benefit of affected class members.

37.     Moreover, the class representatives have retained counsel to represent themselves and class members who have extensive experience representing parties and class actions involving, mass torts and property claims, and who have knowledge and experience of the law and claims presented in this lawsuit and the procedural nature of Rule 23, as a procedural mechanism to bring a lawsuit to decide a common liability for and bring relief for a group of affected persons.

38.     Pursuant to Fed. R. Civ. P. 23(b)(1)(A) & (B), this lawsuit should be certified as a class action because individually affected members who prosecute separate actions would cause

14

multiplicity of litigation, there would be risk of inconsistent findings on the same set of operative facts of liability, there would be inconsistent and varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants and individual adjudications would as a practical matter affect the interests and rights of individual persons not made a party to this lawsuit.

39.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), the common questions of law and fact predominate over any questions affecting individual members.  Further, maintaining this lawsuit as a collective action is a superior means of litigating this case because it eliminates multiple lawsuits involving the same operative set of liability facts, multiple litigation with the same witnesses and Defendants, risk of inconsistent adjudication and standards and preserves the rights of individuals who might be affected by disposition of an individual lawsuit, of which they are not a party.  Further, all of the requirements for Rule 23 are satisfied in that the Defendants' actions affected all class members in the same manner, making appropriate final declaratory and injunctive relief with respect to the class as a whole.

40.     Plaintiffs respectfully bring this claim as a class action for the diminished value of class members' real property.

### VII. CLAIMS FOR RELIEF

#### *A. Breach of Contract*

41.     Plaintiffs reallege the preceding paragraphs and incorporates them by reference herein as though stated word-for-word.

42.     An easement is an interest in the land of another and presents a burden on the owner of the property.  The easement is the dominant tenement over the property and runs with the land.

43.     Plaintiffs, as other property owners situated along the Pegasus Pipeline, have a written easement on their property allowing the operation and maintenance of the Pegasus Pipeline. *See* easement attached hereto as Exhibit "4," and incorporated herein by reference and hereby made a part of the record hereof.

44.     This easement is a form easement document that is similar for all property owners who have the Pegasus Pipeline on their property.   The Webbs' property easement, and the standardized easement for other class members, provides that the Defendants as the holder of the easement must maintain the property.   Specifically, the easement agreement provides limitations on the property as follows:

> **Conditions, Limitations and Recitals**: # the rights of way, easements and privileges to lay, repair, maintain, operate and remove pipelines and replace existing lines with other lines for the transportation of oil and gas and the products thereof, water or any other fluid substance and to erect, repair, maintain, remove and operate electric lines through grantor's land .....

45.     The easement further provides:

> "To have and to hold unto said Magnolia Pipe Line Co. its successors and assigns, for the purposes aforesaid.   The said Grantors shall have the right fully to use and enjoy the said premises except for the purposes hereinbefore granted to Magnolia Pipe Line Company, its successors and assigns, whcih [which] hereby agrees to pay any damages that may arise to crops, timber or fences from the use of said premises for such purposes ...."

46.     The Pegasus Pipeline is in an unsafe, defective and unreasonably dangerous condition that is similarly situated and maintained in a defective, unsafe condition under a predominating course of corporate policy, pattern, practice and conduct, which includes, but is not limited to the same or similar inspection, maintenance, evaluation, operation and analysis.

47.     Defendants' unsafe, defective and unreasonably dangerous condition of the Pegasus Pipeline under a common course of corporate policy, pattern, practice and wrongful conduct pertaining to negligent inspection, maintenance, evaluation, operation and analysis is a

material breach of the contractual easement for Plaintiffs and the class members located along the Pegasus Pipeline.

48.     Defendants' material breach of the contractual easement for Plaintiffs and the class members creates an immediate zone of danger to the Plaintiffs and class members who have the Pipeline on their property pursuant to an easement.

49.     Plaintiffs and class members are entitled to rescission of the easements and for an order enjoining Defendants from operating the Pegasus Pipeline and further ordering Defendants to remove the Pegasus Pipeline from the easements, or in the alternative, damages for breach of contract, including diminished value to their property.

## XIII. DEMAND FOR JURY TRIAL

50.     Pursuant to Ark. R. Civ. P. 38, Fed. R. Civ. P. 38, Ark. Const. Art. 2, § 7, Ark. Code Ann. § 16-64-103, Plaintiffs hereby demand a trial by jury of all issues of fact.

## IX. DEMAND AND PRAYER

51.     Plaintiffs respectfully pray this Court enter orders and judgment against Defendants as follows:

      (a)    For an order certifying this lawsuit to proceed as a class action;

      (b)    For an order appointing Plaintiffs as Class Representatives and appointing their counsel as counsel for all Class members;

      (c)    For rescission of the easements and orders of this Court enjoining Defendants from operating the Pegasus Pipeline and ordering Defendants to remove the Pegasus Pipeline from the property of the class members;

      (d)    In the alternative, for compensatory damages for each Class member;

      (e)    For pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

      (f)    For costs, expenses and fees;

      (g)    For attorney's fees pursuant to Ark. Code Ann. § 16-22-308, or common fund; and

      (i)    For all other relief deemed, equitable, appropriate and just.

Respectfully submitted,
**DUNCAN FIRM, P.A.**

By:

Phillip Duncan, ABN #74039
Richard Quintus, ABN #2000078
William Rob Pointer, ABN #2007216
Justin C. Zachary, ABN #2010162
Timothy P. Reed, ABN #2012210
DUNCAN FIRM, P.A.
900 South Shackleford Road, Suite 725
Little Rock, Arkansas 72211
Telephone: 501-228-7600
Facsimile: 501-228-0415
phillip@duncanfirm.com
richard@duncanfirm.com
rob@duncanfirm.com
justin@duncanfirm.com
tim@duncanfirm.com

-and-

**THRASH LAW FIRM, P.A.**

Thomas P. Thrash, ABN #80147
Marcus N. Bozeman, ABN #95287
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058
Facsimile: 501-374-2222
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

-and-

John W. "Don" Barrett
DON BARRETT, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095
662-834-9168 – Telephone
662-834-2628 – Facsimile
dbarrett@barrettlawgroup.com

19



EXHIBIT

1



Product Name: WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 1 of 1

# MATERIAL SAFETY DATA SHEET

| SECTION 1 | PRODUCT AND COMPANY IDENTIFICATION |
|---|---|

**PRODUCT**
    **Product Name:  WABASCA HEAVY CRUDE OIL**
    **Product Description:**  Petroleum Crude Oil
    **Product Code:**  949802-00,  97F826
    **Intended Use:**  Crude oil

**COMPANY IDENTIFICATION**
        Supplier:         **EXXONMOBIL UPSTREAM PRODUCTION**
                       EXXONMOBIL BUILDING
                       800 BELL STREET
                       HOUSTON, TX.  77002   USA
    **24 Hour Health Emergency**           609-737-4411
    **ExxonMobil Transportation No.**     281-834-3296 / EMERGENCY 800-424-9300

| SECTION 2 | COMPOSITION / INFORMATION ON INGREDIENTS |
|---|---|

**Reportable Hazardous Substance(s) or Complex Substance(s)**

| Name | CAS# | Concentration* |
|---|---|---|
| PETROLEUM CRUDE OIL | 8002-05-9 | 100 % |

**Hazardous Constituent(s) Contained in Complex Substance(s)**

| Name | CAS# | Concentration* |
|---|---|---|
| BENZENE | 71-43-2 | 1 - 5% |
| CYCLOHEXANE | 110-82-7 | 1 - 5% |
| ETHYL BENZENE | 100-41-4 | 0.1 - 1% |
| HYDROGEN SULFIDE | 7783-06-4 | > 0.005 % |
| N-HEXANE | 110-54-3 | 1 - 5% |
| NAPHTHALENE | 91-20-3 | 1 - 5% |
| POLYNUCLEAR AROMATIC HYDROCARBONS | | > 0.1% |
| SULFUR | 7704-34-9 | > 1.0 % |
| TOLUENE | 108-88-3 | 1 - 5% |
| XYLENES | 1330-20-7 | 1 - 5% |

* All concentrations are percent by weight unless material is a gas.  Gas concentrations are in percent by volume.

| SECTION 3 | HAZARDS IDENTIFICATION |
|---|---|

This material is considered to be hazardous according to regulatory guidelines (see (M)SDS Section 15).

**POTENTIAL PHYSICAL / CHEMICAL EFFECTS**
    Extremely flammable.  Material can release vapors that readily form flammable mixtures.  Vapor accumulation could flash and/or explode if ignited.  Material can accumulate static charges which may cause an ignition.

**POTENTIAL HEALTH EFFECTS**
    May cause cancer.  Danger of adverse health effects by prolonged exposure.  Repeated exposure may cause





**Product Name:** WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 2 of 2

---

skin dryness or cracking.  If swallowed, may be aspirated and cause lung damage.  Under conditions of poor personal hygiene and prolonged repeated contact, some polycyclic aromatic compounds (PACs) have been suspected as a cause of skin cancer in humans.  Hydrogen sulfide, a highly toxic gas, is expected to be present.  Signs and symptoms of overexposure to hydrogen sulfide include respiratory and eye irritation, dizziness, nausea, coughing, a sensation of dryness and pain in the nose, and loss of consciousness.  Odor does not provide a reliable indicator of the presence of hazardous levels in the atmosphere.  May be irritating to the eyes, nose, throat, and lungs.  Aliphatic hydrocarbon gases may build up in confined spaces and  may cause dizziness, light-headedness, headache, nausea and loss of coordination.  Continued inhalation may result in narcosis, unconsciousness, and possibly lead to death.  May cause central nervous system depression.  High-pressure injection under skin may cause serious damage.  Exposure to benzene is associated with cancer (acute myeloid leukemia and myelodysplastic syndrome), damage to the blood-producing system, and serious blood disorders (see Section 11).

**Target Organs:**  Nervous system |   Blood and/or blood-forming organs |   Lung |   Skin |

## ENVIRONMENTAL HAZARDS
Toxic to aquatic organisms, may cause long-term adverse effects in the aquatic environment.

| | | | |
|---|---|---|---|
| **NFPA Hazard ID:** | Health:  2 | Flammability:  3 | Reactivity:  0 |
| **HMIS Hazard ID:** | Health:  2* | Flammability:  3 | Reactivity:  0 |

**NOTE:**  This material should not be used for any other purpose than the intended use in Section 1 without expert advice. Health studies have shown that chemical exposure may cause potential human health risks which may vary from person to person.

| SECTION 4 | FIRST AID MEASURES |
|---|---|

## INHALATION
Immediately remove from further exposure.  Get immediate medical assistance.  For those providing assistance, avoid exposure to yourself or others.  Use adequate respiratory protection.  Give supplemental oxygen, if available.  If breathing has stopped, assist ventilation with a mechanical device.

## SKIN CONTACT
Remove contaminated clothing.  Dry wipe exposed skin and cleanse with waterless hand cleaner and follow by washing thoroughly with soap and water.  For those providing assistance, avoid further skin contact to yourself or others.  Wear impervious gloves.  Launder contaminated clothing separately before reuse.  Discard contaminated articles that cannot be laundered.  If product is injected into or under the skin, or into any part of the body, regardless of the appearance of the wound or its size, the individual should be evaluated immediately by a physician as a surgical emergency. Even though initial symptoms from high pressure injection may be minimal or absent, early surgical treatment within the first few hours may significantly reduce the ultimate extent of injury.  For hot product: Immediately immerse in or flush affected area with large amounts of cold water to dissipate heat. Cover with clean cotton sheeting or gauze and get prompt medical attention.

## EYE CONTACT
Flush thoroughly with water for at least 15 minutes.  Get medical assistance.

## INGESTION
Seek immediate medical attention.  Do not induce vomiting.

## NOTE TO PHYSICIAN
If ingested, material may be aspirated into the lungs and cause chemical pneumonitis.  Treat appropriately.



Product Name:  WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 3 of  3

This light hydrocarbon material, or a component, may be associated with cardiac sensitization following very high exposures (well above occupational exposure limits) or with concurrent exposure to high stress levels or heart-stimulating substances like epinephrine.  Administration of such substances should be avoided.

| SECTION 5 | FIRE FIGHTING MEASURES |
|---|---|

**EXTINGUISHING MEDIA**
   **Appropriate Extinguishing Media:** Use water fog, foam, dry chemical or carbon dioxide (CO2) to extinguish flames.

   **Inappropriate Extinguishing Media:** Straight Streams of Water

**FIRE FIGHTING**
   **Fire Fighting Instructions:** Evacuate area.  If a leak or spill has not ignited, use water spray to disperse the vapors and to protect personnel attempting to stop a leak.  Prevent runoff from fire control or dilution from entering streams, sewers, or drinking water supply.  Firefighters should use standard protective equipment and in enclosed spaces, self-contained breathing apparatus (SCBA).  Use water spray to cool fire exposed surfaces and to protect personnel.

   **Unusual Fire Hazards:** Highly flammable.  Vapors are flammable and heavier than air.  Vapors may travel across the ground and reach remote ignition sources causing a flashback fire danger.  Exposure to fire can generate toxic fumes.  Hazardous material. Firefighters should consider protective equipment indicated in Section 8.

   **Hazardous Combustion Products:**  Hydrogen sulfide, Smoke, Fume, Sulfur oxides, Incomplete combustion products, Oxides of carbon

**FLAMMABILITY PROPERTIES**
   **Flash Point [Method]:** <21°C  (70°F)  [ASTM D-92]
   **Flammable Limits (Approximate volume % in air):** LEL:  N/D     UEL:  N/D
   **Autoignition Temperature:** N/D

| SECTION 6 | ACCIDENTAL RELEASE MEASURES |
|---|---|

**NOTIFICATION PROCEDURES**
   In the event of a spill or accidental release, notify relevant authorities in accordance with all applicable regulations. US regulations  require reporting releases of this material to the environment which exceed the applicable reportable quantity or oil spills which could reach any waterway including intermittent dry creeks. The National Response Center can be reached at (800)424-8802.

**PROTECTIVE MEASURES**
   Avoid contact with spilled material.  Warn or evacuate occupants in surrounding and downwind areas if required due to toxicity or flammability of the material.  See Section 5 for fire fighting information.  See the Hazard Identification Section for Significant Hazards.  See Section 4 for First Aid Advice.  See Section 8 for advice on the minimum requirements for personal protective equipment. Additional protective measures may be necessary, depending on the specific circumstances and/or the expert judgment of the emergency responders.

   For emergency responders:  Respiratory protection: half-face or full-face respirator with filter(s) for organic vapor and, when applicable, H2S, or Self Contained Breathing Apparatus (SCBA) can be used depending on



Product Name:  WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 4 of 4

the size of spill and potential level of exposure.  If the exposure cannot be completely characterized or an oxygen deficient atmosphere is possible or anticipated, SCBA is recommended.   Chemical goggles are recommended if splashes or contact with eyes is possible.  Work gloves that are resistant to aromatic hydrocarbons are recommended.  If contact with hot product is possible or anticipated, gloves should be heat-resistant and thermally insulated.  Note: gloves made of PVA are not water-resistant, and are not suitable for emergency use.  Small spills: normal antistatic work clothes are usually adequate.  Large spills: full body suit of chemical resistant, antistatic and, if necessary, heat resistant and thermal insulated material is recommended.

## SPILL MANAGEMENT

**Land Spill:** Eliminate all ignition sources (no smoking, flares, sparks or flames in immediate area).  Stop leak if you can do it without risk.  All equipment used when handling the product must be grounded.  Do not touch or walk through spilled material.  Prevent entry into waterways, sewer, basements or confined areas.  A vapor suppressing foam may be used to reduce vapors.  Large Spills:  Water spray may reduce vapor; but may not prevent ignition in closed spaces.

**Water Spill:** Stop leak if you can do it without risk.  Warn other shipping.  Remove from the surface by skimming or with suitable absorbents.  If permitted by regulatory authorities the use of suitable dispersants should be considered where indicated in local oil spill contingency plans.

Water spill and land spill recommendations are based on the most likely spill scenario for this material; however, geographic conditions, wind, temperature, (and in the case of a water spill) wave and current direction and speed may greatly influence the appropriate action to be taken.  For this reason, local experts should be consulted.  Note:  Local regulations may prescribe or limit action to be taken.

## ENVIRONMENTAL PRECAUTIONS

Use booms as a barrier to protect shorelines.   Use containment booms when the ambient temperature is below the flash point of the material.  Large Spills: Dike far ahead of liquid spill for later recovery and disposal.  Prevent entry into waterways, sewers, basements or confined areas.

| SECTION 7 | HANDLING AND STORAGE |
|---|---|

## HANDLING

H2S is present.  Avoid all personal contact.  Crude oils can contain trace levels of natural impurities including heavy metals, such as  mercury, nickel or lead, as well as naturally occurring radioactive material.  As the impurity content may concentrate during refining/processing, process operations, including equipment, materials and products should be evaluated to identify and manage any potential risks to health, safety or the environment or regulatory concerns.
Prevent exposure to ignition sources, for example use non-sparking tools and explosion-proof equipment.
Potentially toxic/irritating fumes/vapors may be evolved from heated or agitated material.  Use only with adequate ventilation.  Do not enter storage areas or confined spaces unless adequately ventilated.  The toxic and olfactory (sense of smell) fatigue properties of hydrogen sulfide require that air monitoring alarms and respiratory protection be used where the concentration might be expected to reach a harmful level, such as in an enclosed space, heated transport vessel, or in a spill or leak situation.
Material may contain trace amounts of naturally occurring radioactive material (NORM), which will accumulate in process equipment and storage vessels. Prevent small spills and leakage to avoid slip hazard.  Material can accumulate static charges which may cause an electrical spark (ignition source).  Use proper bonding and/or ground procedures.  However, bonding and grounds may not eliminate the hazard from static accumulation.  Consult local applicable standards for guidance.  Additional references include American Petroleum Institute 2003 (Protection Against Ignitions Arising out of Static, Lightning and Stray Currents) or National Fire Protection Agency 77 (Recommended Practice on Static Electricity) or CENELEC CLC/TR 50404 (Electrostatics - Code of practice for the avoidance of hazards due to static electricity).



Product Name:   WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 5 of 5

___

**Static Accumulator:**   This material is a static accumulator.  A liquid is typically considered a nonconductive, static accumulator if its conductivity is below 100 pS/m (100x10E-12 Siemens per meter) and is considered a semiconductive, static accumulator if its conductivity is below 10,000 pS/m.  Whether a liquid is nonconductive or semiconductive, the precautions are the same.  A number of factors, for example liquid temperature, presence of contaminants, anti-static additives and filtration can greatly influence the conductivity of a liquid.

## STORAGE

Ample fire water supply should be available.  A fixed sprinkler/deluge system is recommended.  The container choice, for example storage vessel, may effect static accumulation and dissipation.  Keep container closed. Handle containers with care.  Open slowly in order to control possible pressure release.  Store in a cool, well-ventilated area.  Outside or detached storage preferred.  Storage containers should be grounded and bonded. Fixed storage containers, transfer containers and associated equipment should be grounded and bonded to prevent accumulation of static charge.

| SECTION 8 | EXPOSURE CONTROLS / PERSONAL PROTECTION |
|---|---|

**EXPOSURE LIMIT VALUES**

**Exposure limits/standards (Note: Exposure limits are not additive)**

| Source | Form | Limit / Standard | | NOTE | Source |
|---|---|---|---|---|---|
| BENZENE | | OSHA Action level | 0.5 ppm | N/A | OSHA Sp.Reg. |
| BENZENE | | STEL | 5 ppm | N/A | OSHA Sp.Reg. |
| BENZENE | | TWA | 1 ppm | N/A | OSHA Sp.Reg. |
| BENZENE | | STEL | 1 ppm | N/A | ExxonMobil |
| BENZENE | | TWA | 0.5 ppm | N/A | ExxonMobil |
| BENZENE | | STEL | 2.5 ppm | Skin | ACGIH |
| BENZENE | | TWA | 0.5 ppm | Skin | ACGIH |
| CYCLOHEXANE | | TWA | 1050 mg/m3 | 300 ppm | N/A | OSHA Z1 |
| CYCLOHEXANE | | TWA | 100 ppm | | N/A | ACGIH |
| ETHYL BENZENE | | TWA | 435 mg/m3 | 100 ppm | N/A | OSHA Z1 |
| ETHYL BENZENE | | TWA | 20 ppm | | N/A | ACGIH |
| HYDROGEN SULFIDE | | Ceiling | 20 ppm | | N/A | OSHA Z2 |
| HYDROGEN SULFIDE | | Maximum concentration | 50 ppm | | N/A | OSHA Z2 |
| HYDROGEN SULFIDE | | STEL | 14 mg/m3 | 10 ppm | N/A | ExxonMobil |
| HYDROGEN SULFIDE | | TWA | 7 mg/m3 | 5 ppm | N/A | ExxonMobil |
| HYDROGEN SULFIDE | | STEL | 5 ppm | | N/A | ACGIH |
| HYDROGEN SULFIDE | | TWA | 1 ppm | | N/A | ACGIH |
| N-HEXANE | | TWA | 1800 mg/m3 | 500 ppm | N/A | OSHA Z1 |
| N-HEXANE | | TWA | 50 ppm | | Skin | ACGIH |
| NAPHTHALENE | | TWA | 50 mg/m3 | 10 ppm | N/A | OSHA Z1 |
| NAPHTHALENE | | STEL | 15 ppm | | Skin | ACGIH |
| NAPHTHALENE | | TWA | 10 ppm | | Skin | ACGIH |
| TOLUENE | | Ceiling | 300 ppm | | N/A | OSHA Z2 |
| TOLUENE | | Maximum | 500 ppm | | N/A | OSHA Z2 |



Product Name:  WABASCA HEAVY CRUDE OIL
Revision Date:  09 Jan 2013
Page 6 of  6

| | | concentration | | | | |
|---|---|---|---|---|---|---|
| TOLUENE | | TWA | 200 ppm | | N/A | OSHA Z2 |
| TOLUENE | | TWA | 20 ppm | | N/A | ACGIH |
| XYLENES | | TWA | 435 mg/m3 | 100 ppm | N/A | OSHA Z1 |
| XYLENES | | STEL | 150 ppm | | N/A | ACGIH |
| XYLENES | | TWA | 100 ppm | | N/A | ACGIH |

NOTE: Limits/standards shown for guidance only.  Follow applicable regulations.

**ENGINEERING CONTROLS**

> The level of protection and types of controls necessary will vary depending upon potential exposure conditions. Control measures to consider:
> > Use explosion-proof ventilation equipment to stay below exposure limits.

**PERSONAL PROTECTION**

> Personal protective equipment selections vary based on potential exposure conditions such as applications, handling practices, concentration and ventilation.  Information on the selection of protective equipment for use with this material, as provided below, is based upon intended, normal usage.

> **Respiratory Protection:**  If engineering controls do not maintain airborne contaminant concentrations at a level which is adequate to protect worker health, an approved respirator may be appropriate.  Respirator selection, use, and maintenance must be in accordance with regulatory requirements, if applicable.  Types of respirators to be considered for this material include:
> > Positive-pressure, air-supplied respirator in areas where H2S vapors may accumulate is recommended.

> For high airborne concentrations, use an approved supplied-air respirator, operated in positive pressure mode. Supplied air respirators with an escape bottle may be appropriate when oxygen levels are inadequate, gas/vapor warning properties are poor, or if air purifying filter capacity/rating may be exceeded.

> **Hand Protection:**  Any specific glove information provided is based on published literature and glove manufacturer data.  Glove suitability and breakthrough time will differ depending on the specific use conditions. Contact the glove manufacturer for specific advice on glove selection and breakthrough times for your use conditions. Inspect and replace worn or damaged gloves. The types of gloves to be considered for this material include:
> > Chemical resistant gloves are recommended. If contact with forearms is likely wear gauntlet style gloves.

> **Eye Protection:**  Chemical goggles are recommended.

> **Skin and Body Protection:**  Any specific clothing information provided is based on published literature or manufacturer data.  The types of clothing to be considered for this material include:
> > Chemical / oil resistant clothing if contact with material is likely.

> **Specific Hygiene Measures:**  Always observe good personal hygiene measures, such as washing after handling the material and before eating, drinking, and/or smoking.  Routinely wash work clothing and protective equipment to remove contaminants.  Discard contaminated clothing and footwear that cannot be cleaned.



Product Name:   WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 7 of 7

_____

Practice good housekeeping.

**ENVIRONMENTAL CONTROLS**
Comply with applicable environmental regulations limiting discharge to air, water and soil. Protect the environment by applying appropriate control measures to prevent or limit emissions.

| SECTION 9 | PHYSICAL AND CHEMICAL PROPERTIES |
|---|---|

**Note: Physical and chemical properties are provided for safety, health and environmental considerations only and may not fully represent product specifications. Contact the Supplier for additional information.**

**GENERAL INFORMATION**
**Physical State:**   Liquid
**Color:**   Dark Brown
**Odor:**   Rotten Egg
**Odor Threshold:**   N/D

**IMPORTANT HEALTH, SAFETY, AND ENVIRONMENTAL INFORMATION**
**Relative Density (at 15 °C):**   0.661 - 1.013
**Flash Point [Method]:**   <21°C (70°F) [ASTM D-92]
**Flammable Limits (Approximate volume % in air):** LEL: N/D    UEL: N/D
**Autoignition Temperature:** N/D
**Boiling Point / Range:**   > 35°C (95°F)
**Vapor Density (Air = 1):** N/D
**Vapor Pressure:**   0 kPa (0 mm Hg) at 20 C -  106.4 kPa (800 mm Hg) at 20 °C
**Evaporation Rate (n-butyl acetate = 1):** N/D
**pH:** N/A
**Log Pow (n-Octanol/Water Partition Coefficient):** N/D
**Solubility in Water:** Negligible
**Viscosity:** >0.42 cSt (0.42 mm2/sec) at 40 °C
**Oxidizing Properties:** See Hazards Identification Section.

**OTHER INFORMATION**
**Freezing Point:** N/D
**Melting Point:** N/A
**Pour Point:**   -73°C (-100°F) - 48°C  (118°F)
**Decomposition Temperature:** N/D

| SECTION 10 | STABILITY AND REACTIVITY |
|---|---|

**STABILITY:** Material is stable under normal conditions.

**CONDITIONS TO AVOID:** Avoid heat, sparks, open flames and other ignition sources.

**MATERIALS TO AVOID:** Strong oxidizers

**HAZARDOUS DECOMPOSITION PRODUCTS:** Material does not decompose at ambient temperatures.

**HAZARDOUS POLYMERIZATION:** Will not occur.



Product Name:   WABASCA HEAVY CRUDE OIL
Revision Date:  09 Jan 2013
Page 8 of  8

---

| SECTION 11 | TOXICOLOGICAL INFORMATION |
|---|---|

## ACUTE TOXICITY

| Route of Exposure | Conclusion / Remarks |
|---|---|
| **Inhalation** | |
| Toxicity (Rat): No end point data for material. | Not determined. |
| Irritation: No end point data for material. | Elevated temperatures or mechanical action may form vapors, mist, or fumes which may be irritating to the eyes, nose, throat, or lungs.   Based on assessment of the components. |
| | |
| **Ingestion** | |
| Toxicity (Rat): LD50 > 5000 mg/kg | Minimally Toxic. Based on test data for structurally similar materials. |
| | |
| **Skin** | |
| Toxicity (Rabbit): LD50 > 2000 mg/kg | Minimally Toxic. Based on test data for structurally similar materials. |
| Irritation (Rabbit): Data available. | May dry the skin leading to discomfort and dermatitis. Based on test data for structurally similar materials. |
| | |
| **Eye** | |
| Irritation (Rabbit): Data available. | Irritating and will injure eye tissue. Based on test data for structurally similar materials. |

## CHRONIC/OTHER EFFECTS

**For the product itself:**
Vapor/aerosol concentrations above recommended exposure levels are irritating to the eyes and respiratory tract, may cause headaches, dizziness, anesthesia, drowsiness, unconsciousness and other central nervous system effects including death.
May cause central nervous system disorder (e.g., narcosis involving a loss of coordination, weakness, fatigue, mental confusion and blurred vision) and/or damage.
Small amounts of liquid aspirated into the lungs during ingestion or from vomiting may cause chemical pneumonitis or pulmonary edema.  Very high exposure (confined spaces / abuse) to light hydrocarbons may result in abnormal heart rhythm (arrhythmias).  Concurrent high stress levels and/or co-exposure to high levels of hydrocarbons (above occupational exposure limits), and to heart-stimulating substances like epinephrine, nasal decongestants, asthma drugs, or cardiovascular drugs may initiate arrhythmias.
Crude oil: Contains polycyclic aromatic compounds (PACs).  Prolonged and / or repeated exposure by skin or inhalation of certain PACs may cause cancer of the skin, lung, and of other sites of the body.  In animal studies, some crudes produced skin tumors in mice, while other crudes produced no tumors.  Developmental studies of crude oil in lab animals showed reduced fetal weight and increased fetal resorptions at maternally toxic levels. Repeated dermal exposure to crude oils in rats resulted in toxicity to the blood, liver, thymus, and bone morrow.

**Contains:**
BENZENE:  Caused cancer (acute myeloid leukemia and myelodysplastic syndrome), damage to the blood-producing system, and serious blood disorders in human studies.  Caused genetic effects and effects on the immune system in laboratory animal and some human studies.  Caused toxicity to the fetus and cancer in laboratory animal studies.  HYDROGEN SULFIDE :  Chronic health effects due to repeated exposures to low levels of H2S have not been established. High level (700 ppm) acute exposure can result in sudden death. High concentrations will lead to cardiopulmonary arrest due to nervous system toxicity and pulmonary edema. Lower levels (150 ppm) may overwhelm sense of smell, eliminating warning of exposure. Symptoms of overexposure to H2S include headache, fatigue, insomnia, irritability, and gastrointestinal problems. Repeated exposures to



**Product Name:   WABASCA HEAVY CRUDE OIL**
Revision Date:  09 Jan 2013
Page 9 of  9

---

approximately 25 ppm will irritate mucous membranes and the respiratory system and have been implicated in some eye damage.
NAPHTHALENE:  Exposure to high concentrations of naphthalene may cause destruction of red blood cells, anemia, and cataracts. Naphthalene caused cancer in laboratory animal studies, but the relevance of these findings to humans is uncertain.
N-HEXANE: Prolonged and/or repeated exposures to n-Hexane can cause progressive and potentially irreversible damage to the peripheral nervous system (e.g. fingers, feet, arms, legs, etc.).  Simultaneous exposure to Methyl Ethyl Ketone (MEK) or Methyl Isobutyl Ketone (MIBK) and n-Hexane can potentiate the risk of adverse effects from n-Hexane on the peripheral nervous system.  n-Hexane has been shown to cause testicular damage at high doses in male rats.  The relevance of this effect for humans is unknown.
TOLUENE :   Concentrated, prolonged or deliberate inhalation may cause brain and nervous system damage.  Prolonged and repeated exposure of pregnant animals (> 1500 ppm) have been reported to cause adverse fetal developmental effects.
ETHYLBENZENE:  Caused cancer in laboratory animal studies. The relevance of these findings to humans is uncertain.

Additional information is available by request.

**The following ingredients are cited on the lists below:**

| Chemical Name | CAS Number | List Citations |
|---|---|---|
| NAPHTHALENE | 91-20-3 | 2, 5 |
| BENZENE | 71-43-2 | 1, 3, 6 |
| ETHYL BENZENE | 100-41-4 | 5 |

                          --REGULATORY LISTS SEARCHED--
1 = NTP CARC            3 = IARC 1             5 = IARC 2B
2 = NTP SUS             4 = IARC 2A            6 = OSHA CARC

---

| SECTION 12 | ECOLOGICAL INFORMATION |
|---|---|

The information given is based on data available for the material, the components of the material, and similar materials.

**ECOTOXICITY**
        Material -- Expected to be toxic to aquatic organisms. May cause long-term adverse effects in the aquatic environment.

**MOBILITY**
        More volatile component -- Highly volatile, will partition rapidly to air.  Not expected to partition to sediment and wastewater solids.
        Less volatile component -- Low solubility and floats and is expected to migrate from water to the land.
        Expected to partition to sediment and wastewater solids.

**PERSISTENCE AND DEGRADABILITY**
**Biodegradation:**
        Low molecular wt. component --  Expected to be inherently biodegradable
        High molecular wt. component -- Expected to biodegrade slowly.
**Photolysis:**
        More water soluble component -- Expected to degrade at a moderate rate in water when exposed to sunlight.
**Atmospheric Oxidation:**



Product Name: WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 10 of 10

More volatile component -- Expected to degrade rapidly in air

**BIOACCUMULATION POTENTIAL**
   Components -- Has the potential to bioaccumulate.

| SECTION 13 | DISPOSAL CONSIDERATIONS |
|---|---|

Disposal recommendations based on material as supplied. Disposal must be in accordance with current applicable laws and regulations, and material characteristics at time of disposal.

**DISPOSAL RECOMMENDATIONS**
   Product is suitable for burning in an enclosed controlled burner for fuel value or disposal by supervised incineration at very high temperatures to prevent formation of undesirable combustion products.

**REGULATORY DISPOSAL INFORMATION**
   RCRA Information: Disposal of unused product may be subject to RCRA regulations (40 CFR 261). Disposal of the used product may also be regulated due to ignitability, corrosivity, reactivity or toxicity as determined by the Toxicity Characteristic Leaching Procedure (TCLP). Potential RCRA characteristics: IGNITABILITY. TCLP (BENZENE)

**Empty Container Warning** Empty Container Warning (where applicable): Empty containers may contain residue and can be dangerous. Do not attempt to refill or clean containers without proper instructions. Empty drums should be completely drained and safely stored until appropriately reconditioned or disposed. Empty containers should be taken for recycling, recovery, or disposal through suitably qualified or licensed contractor and in accordance with governmental regulations. DO NOT PRESSURISE, CUT, WELD, BRAZE, SOLDER, DRILL, GRIND, OR EXPOSE SUCH CONTAINERS TO HEAT, FLAME, SPARKS, STATIC ELECTRICITY, OR OTHER SOURCES OF IGNITION. THEY MAY EXPLODE AND CAUSE INJURY OR DEATH.

| SECTION 14 | TRANSPORT INFORMATION |
|---|---|

**LAND (DOT)**
   **Proper Shipping Name:** PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC
   **Hazard Class & Division:** 3
   **ID Number:** 3494
   **Packing Group:** II
   **ERG Number:** 131
   **Label(s):** 3 (6.1)
   **Transport Document Name:** UN3494, PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC, 3 (6.1), PG II

**LAND (TDG)**
   **Proper Shipping Name:** PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC
   **Hazard Class & Division:** 3 (6.1)
   **UN Number:** 3494
   **Packing Group:** II



**Product Name:** WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 11 of 11

---

Footnote:  If shipped over water, product TDG classification as shown below for SEA (IMDG).

**SEA (IMDG)**
    **Proper Shipping Name:**  PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC
    **Hazard Class & Division:**  3
    **EMS Number:**  F-E, S-E
    **UN Number:**  3494
    **Packing Group:**  II
    **Marine Pollutant:**  Yes
    **Label(s):**  3 (6.1)
    **Transport Document Name:**  UN3494, PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC, 3 (6.1),
    PG II, (21°C c.c.), MARINE POLLUTANT

**AIR (IATA)**
    **Proper Shipping Name:**  PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC
    **Hazard Class & Division:**  3
    **UN Number:**  3494
    **Packing Group:**  II
    **Label(s) / Mark(s):**  3 (6.1)
    **Transport Document Name:**  UN3494, PETROLEUM SOUR CRUDE OIL, FLAMMABLE, TOXIC, 3 (6.1), PG
    II

| SECTION 15 | REGULATORY INFORMATION |
|---|---|

**OSHA HAZARD COMMUNICATION STANDARD:**  When used for its intended purpose, this material is classified as hazardous in accordance with OSHA 29CFR 1910.1200.

**Complies with the following national/regional chemical inventory requirements::**  AICS, DSL, ENCS, IECSC, KECI, PICCS, TSCA

**EPCRA SECTION 302:**  This material contains no extremely hazardous substances.

**CERCLA:**  This material is not subject to any special reporting under the requirements of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).  Contact local authorities to determine if other reporting requirements apply.

**SARA (311/312) REPORTABLE HAZARD CATEGORIES:**  Fire.  Delayed Health.

**SARA (313) TOXIC RELEASE INVENTORY:**

| Chemical Name | CAS Number | Typical Value |
|---|---|---|
| ETHYL BENZENE | 100-41-4 | 0.1 - 1% |
| POLYNUCLEAR AROMATIC HYDROCARBONS | | > 0.1% |
| NAPHTHALENE | 91-20-3 | 1 - 5% |
| N-HEXANE | 110-54-3 | 1 - 5% |
| BENZENE | 71-43-2 | 1 - 5% |
| CYCLOHEXANE | 110-82-7 | 1 - 5% |



Product Name:   WABASCA HEAVY CRUDE OIL
Revision Date:  09 Jan 2013
Page 12 of  12

| XYLENES | 1330-20-7 | 1 - 5% |
| PETROLEUM CRUDE OIL | 8002-05-9 | 100 % |

**The following ingredients are cited on the lists below:**

| Chemical Name | CAS Number | List Citations |
|---|---|---|
| BENZENE | 71-43-2 | 1, 2, 4, 10, 11, 13, 15, 16, 17, 18, 19 |
| CYCLOHEXANE | 110-82-7 | 1, 4, 13, 16, 17, 18, 19 |
| ETHYL BENZENE | 100-41-4 | 1, 4, 10 |
| HYDROGEN SULFIDE | 7783-06-4 | 1, 4 |
| N-HEXANE | 110-54-3 | 1, 4, 13, 16, 17, 18, 19 |
| NAPHTHALENE | 91-20-3 | 1, 4, 9, 10, 13, 16, 17, 18, 19 |
| PETROLEUM CRUDE OIL | 8002-05-9 | 13, 16, 17, 18, 19 |
| SULFUR | 7704-34-9 | 17, 19 |
| TOLUENE | 108-88-3 | 1, 4, 11, 13, 15, 16, 17, 18, 19 |
| XYLENES | 1330-20-7 | 1, 4, 9, 13, 15, 16, 17, 18, 19 |

## --REGULATORY LISTS SEARCHED--

| | | | |
|---|---|---|---|
| 1 = ACGIH ALL | 6 = TSCA 5a2 | 11 = CA P65 REPRO | 16 = MN RTK |
| 2 = ACGIH A1 | 7 = TSCA 5e | 12 = CA RTK | 17 = NJ RTK |
| 3 = ACGIH A2 | 8 = TSCA 6 | 13 = IL RTK | 18 = PA RTK |
| 4 = OSHA Z | 9 = TSCA 12b | 14 = LA RTK | 19 = RI RTK |
| 5 = TSCA 4 | 10 = CA P65 CARC | 15 = MI 293 | |

Code key: CARC=Carcinogen; REPRO=Reproductive

| SECTION 16 | OTHER INFORMATION |
|---|---|

N/D = Not determined, N/A = Not applicable

**THIS SAFETY DATA SHEET CONTAINS THE FOLLOWING REVISIONS:**
Revision Changes:
Section 06: Protective Measures was modified.
Section 09: Boiling Point C(F) was modified.
Section 09: Pour Point C(F) was modified.
Section 09: Vapor Pressure was modified.
Hazard Identification: Health Hazards was modified.
Section 09: Relative Density - Header was modified.
Section 09: Flash Point C(F) was modified.
Section 09: Viscosity was modified.
Section 14: Transport Document Name was modified.
Composition: Component table was modified.
Section 15: List Citations Table was modified.
Section 11: Tox List Cited Table was modified.
Section 15: SARA (313) TOXIC RELEASE INVENTORY - Table was modified.
Composition: Component table was modified.
Section 16: Health Hazards was modified.
Section 08: Exposure Limits Table was modified.
Section 11: Chronic Tox - Component was modified.



Product Name:  WABASCA HEAVY CRUDE OIL
Revision Date:  09 Jan 2013
Page 13 of 13

---

Section 01: Company Contact Methods Sorted by Priority was modified.
Section 04: Pre-existing medical conditions which may be aggravated by exposure - Header was deleted.
Section 04: First Aid Pre-exsiting Medical Conditions was deleted.
**THIS MSDS COVERS THE FOLLOWING MATERIALS:**  CRUDE OIL SOUR ( "Sour" applied by definition of Society of Petroleum Engineers for oils containing sulfur compounds >1%)

---

**PRECAUTIONARY LABEL TEXT:**
**Contains:** PETROLEUM CRUDE OIL
DANGER!
**HEALTH HAZARDS**
May cause cancer.  Danger of adverse health effects by prolonged exposure.  Repeated exposure may cause skin dryness or cracking.  If swallowed, may be aspirated and cause lung damage.  Exposure to benzene is associated with cancer (acute myeloid leukemia and myelodysplastic syndrome), damage to the blood-producing system, and serious blood disorders (see Section 11).  Hydrogen sulfide may concentrate in confined spaces and cause irritation, unconsciousness and/or death.
**Target Organs:** Nervous system |   Blood and/or blood-forming organs |   Lung  |   Skin  |

**PHYSICAL HAZARDS**
Extremely flammable. Material can accumulate static charges which may cause an ignition.

**PRECAUTIONS**
H2S is present.  Avoid contact with skin.  Avoid contact with eyes.  Prevent exposure to ignition sources, for example use non-sparking tools and explosion-proof equipment.  Potentially toxic/irritating fumes/vapors may be evolved from heated or agitated material.  Use only with adequate ventilation.  Do not enter storage areas or confined spaces unless adequately ventilated.  Use proper bonding and/or ground procedures.  However, bonding and grounds may not eliminate the hazard from static accumulation.  The toxic and olfactory (sense of smell) fatigue properties of hydrogen sulfide require that air monitoring alarms and respiratory protection be used where the concentration might be expected to reach a harmful level, such as in an enclosed space, heated transport vessel, or in a spill or leak situation.

**FIRST AID**
**Inhalation:**  Immediately remove from further exposure.  Get immediate medical assistance.  For those providing assistance, avoid exposure to yourself or others.  Use adequate respiratory protection.  Give supplemental oxygen, if available.  If breathing has stopped, assist ventilation with a mechanical device.

**Eye:**  Flush thoroughly with water for at least 15 minutes.  Get medical assistance.

**Oral:**  Seek immediate medical attention.  Do not induce vomiting.

**Skin:**  Remove contaminated clothing.  Dry wipe exposed skin and cleanse with waterless hand cleaner and follow by washing thoroughly with soap and water.  For those providing assistance, avoid further skin contact to yourself or others. Wear impervious gloves.  Launder contaminated clothing separately before reuse.  Discard contaminated articles that cannot be laundered.  If product is injected into or under the skin, or into any part of the body, regardless of the appearance of the wound or its size, the individual should be evaluated immediately by a physician as a surgical emergency. Even though initial symptoms from high pressure injection may be minimal or absent, early surgical treatment within the first few hours may significantly reduce the ultimate extent of injury.  For hot product: Immediately immerse in or flush affected area with large amounts of cold water to dissipate heat. Cover with clean cotton sheeting or gauze and get prompt medical attention.

**FIRE FIGHTING MEDIA**
Use water fog, foam, dry chemical or carbon dioxide (CO2) to extinguish flames.



Product Name:  WABASCA HEAVY CRUDE OIL
Revision Date: 09 Jan 2013
Page 14 of 14

---

**SPILL/LEAK**
**Land Spill:**  Eliminate all ignition sources (no smoking, flares, sparks or flames in immediate area).  Stop leak if you can do it without risk.  Prevent entry into waterways, sewer, basements or confined areas.  A vapor suppressing foam may be used to reduce vapors.  Fully encapsulating, vapor protective clothing should be worn for spills and leaks with no fire.

**Water Spill:**  Stop leak if you can do it without risk.  Warn other shipping.  Remove from the surface by skimming or with suitable absorbents.  Report spills as required to appropriate authorities.  If permitted by regulatory authorities the use of suitable dispersants should be considered where indicated in local oil spill contingency plans.
**Use**
Not intended or suitable for use in or around a household or dwelling.

This warning is given to comply with California Health and Safety Code 25249.6 and does not constitute an admission or a waiver of rights. This product contains a chemical known to the State of California to cause cancer, birth defects, or other reproductive harm.

--------------------------------------------------------------------------------------------------------------------------

The information and recommendations contained herein are, to the best of ExxonMobil's knowledge and belief, accurate and reliable as of the date issued.  You can contact ExxonMobil to insure that this document is the most current available from ExxonMobil.  The information and recommendations are offered for the user's consideration and examination.  It is the user's responsibility to satisfy itself that the product is suitable for the intended use.  If buyer repackages this product, it is the user's responsibility to insure proper health, safety and other necessary information is included with and/or on the container.  Appropriate warnings and safe-handling procedures should be provided to handlers and users.  Alteration of this document is strictly prohibited.  Except to the extent required by law, re-publication or retransmission of this document, in whole or in part, is not permitted.  The term, "ExxonMobil" is used for convenience, and may include any one or more of ExxonMobil Chemical Company, Exxon Mobil Corporation, or any affiliates in which they directly or indirectly hold any interest.

--------------------------------------------------------------------------------------------------------------------------

Internal Use Only
         MHC:  1A, 0, 0, 2, 1, 1                             PPEC:  DVF

 DGN: 7088437VUS  (1014035)
--------------------------------------------------------------------------------------------------------------------------
Copyright 2002 Exxon Mobil Corporation, All rights reserved



**ExxonMobil**
*Pipeline*



**Rights of Way**

O. _____ and wife,
Nora Irby
Witnesses: Howard E. Hageman

To

**Magnolia Pipe Line Company**
**its successors and assigns**

Kind of Instrument: **Easement**
Date of Instrument: May 6, 1947
Date of Ackngmt: May 6, 1947
Consideration: $13.00
Date of Record: June 17, 1947
Book 116    Page 62

Wife    ex d and rh

Is wife's name in granting part of deed or only in dower clause? **Both**

Does each wife join throughout the instrument?  **Yes**    Does each wife

relinquish dower?  **Yes**   Is acknowledgment in form for above?   **Yes**

Acknowledged before _____ H.P. Pine, NP _____ for County of _____ Faulkner

State of **Arkansas**   _____ attached?   **Yes**   State of

Granting clause:  **Grant and convey**

Is any unpaid purchase money mentioned in the deed _____

Conditions, Limitations and Recitals _____

**DESCRIPTION**

N 1/2 of W 1/2 of SW 4 of SE 4 Sec 19, T4N, R13W

_____



EXHIBIT
4-a



County Disclaimer:

This map was created by the Faulkner County Assessor's office and in accordance with Arkansas Code 15-21-502 (2) (B). which states 'The digital cadastre manages and provides access to cadastral information. Digital cadastre does not represent legal property boundary descriptions, nor is it suitable for boundary determination of the individual parcels included in the cadastre.' And Arkansas Code 15-21-502 (6) which indicates that "Digital cadastre' means the storage and manipulation of computerized representations of parcel maps and linked data bases'

This map has been developed from the best available sources. No guarantee of accuracy is granted, nor is any responsibility for reliance thereon assumed. In no event shall said Assessor's office be liable for direct, indirect, incidental, consequential or special damages of any kind, including, but not limited to, loss of anticipated profits or benefits arising out of use of or reliance on the map.

The parcel lines shown are considered a graphical representation of the actual boundaries. The Assessor's office is in no way responsible for or liable for any misrepresentation or re-use of this map. Although this map has been processed successfully on computers at said Assessor's office, no guarantee, expressed or implied, is made by said Assessor's office regarding the use of this map on any other system, nor does the act of distribution constitute or imply any such warranty. Distribution of this map is intended for information purposes and should not be considered authoritative for engineering, legal and other site-specific uses.

I hereby affix my signature stating that I have read the above disclaimer and understand its contents.

Signature:_____ Date:_____

EXHIBIT
4-b